## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------x

| | |
|---|---|
| JASON ORTIZ, KRISTIN BENNETT, and BRIAN DE LA CRUZ, individually and on behalf of all others similarly situated,<br><br>      Plaintiffs,<br>v.<br><br>EDUCATION MANAGEMENT CORPORATION, THE ART INSTITUTE OF NEW YORK CITY, ACCREDITING COUNCIL FOR INDEPENDENT COLLEGES AND SCHOOLS, EDWARD H. WEST, JOHN M. MAZZONI, and TODD S. NELSON,<br><br>      Defendants. | Case No.:<br><br>CLASS ACTION COMPLAINT<br><br>JURY TRIAL DEMANDED |

------------------------------------------------------------------x

## CLASS ACTION COMPLAINT

1.     Plaintiffs Jason Ortiz, Kristin Bennett and Brian De La Cruz bring this action in their individually capacity and on behalf of a class of other similarly situated former students of the Art Institute of New York City against Defendants Education Management Corporation, The Art Institute of New York City, the Accrediting Council For Independent Colleges and Schools ("ACICS"), Edward H. West, John M. Mazzoni and Todd S. Nelson ("Defendants") for fraud, violation of New York General Business Law § 349, violation of the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-2 *et seq*., and violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-1, *et seq*. Plaintiffs also assert a claim individually and on behalf of the Class for unjust enrichment against all Defendants except ACICS.

2.     Plaintiffs are former students of The Art Institute of New York City, a now defunct for-profit school. From September 2011 through May 2014, Plaintiff Jason Ortiz was enrolled as a student at The Art Institute of New York. Plaintiff Ortiz was charged tuition of approximately $30,000 annually, plus additional amounts for room and board, and Plaintiff Ortiz and his family members obtained approximately $155,000 in loans in order to pay for The Art

1

Institute of New York.  From July 2011 through September 2013, Plaintiff Kristin Bennett was enrolled as a student at The Art Institute of New York and paid and/or obtained loans for tuition and room and board of approximately $121,000.  From September 2010 through June 2013, Plaintiff Brian De La Cruz was enrolled as a student at The Art Institute of New York and paid and/or obtained loans to pay for tuition of approximately $30,000 annually to attend The Art Institute of New York.

3.      Defendants have made numerous materially false and misleading statements promoting The Art Institute of New York, including representations that its educational programs met the standards for ACICS accreditation, when they did not, as well as false representations concerning the rate of employment of graduates, the ability of graduates to earn salaries in excess of $28,000 annually, and the employers who would be recruiting on campus. Upon graduating from The Art Institute of New York City, Plaintiffs and other similarly situated class members have struggled to find any employment in their field of study and have been saddled with tuition debt.

4.      Had Plaintiffs known that these statements were materially false, they never would have enrolled in The Art Institute of New York City and would not have agreed to pay $30,000 in annual tuition, plus room and board, in order to attend The Art Institute of New York City.

## THE PARTIES

5.      Plaintiff Jason Ortiz is a resident of New Jersey.  From September 2011 through May 2014, Mr. Ortiz was enrolled as a student at The Art Institute of New York City.  Mr. Ortiz was charged tuition of approximately $30,000 annually by Defendants, plus room and board of approximately $10,000 per year, to attend The Art Institute of New York City.  Mr. Ortiz

2

graduated from The Art Institute of New York City in May 2014 with an Associate Degree in Applied Science in Digital Film Making.

6.      Plaintiff Kristin Bennett is a resident of Bloomsberg, Pennsylvania.  From July 2011 through September 2013, Ms. Bennett was enrolled as a student at The Art Institute of New York City.  Ms. Bennett paid and/or obtained loans to pay for tuition of approximately $112,000 to attend The Art Institute of New York City.  Ms. Bennett earned an Associate Degree in Applied Science in Digital Filmmaking.  The Art Institute of New York City has refused to release Plaintiff Bennett's degree until she pays $5,000 that she allegedly owes for tuition towards her final class.

7.      Plaintiff Brian De La Cruz is a resident of New York City.  From September 2010 through June 2013, Mr. De La Cruz was enrolled as a student at The Art Institute of New York City.  Mr. De La Cruz paid and/or obtained loans to pay for tuition of approximately $30,000 annually to attend The Art Institute of New York City.  Mr. De La Cruz graduated from The Art Institute of New York City in June 2013 with an Associate Degree in Applied Science in Digital Filmmaking.

8.      Defendant Education Management Corporation ("EDMC") is a for-profit company which at all times relevant herein, offered academic programs to students through campus-based and online instruction to earn undergraduate and graduate degrees.  EDMC is a Pennsylvania corporation with its principal office located at 210 Sixth Avenue, Pittsburgh, Pennsylvania.  EDMC's common stock previously traded on the NASDAQ under the ticker symbol "EDMC."  In or around November 2014, the Company voluntarily delisted its securities from the NASDAQ.  During the relevant period, EDMC was one of the largest providers of post-secondary education in North America, with approximately 125,560 enrolled students and $2.3

3

billion in net revenues as of the filing of the Company's last annual report in October 2014.

During the relevant period, EDMC operated in approximately 110 locations across 32 states of

the United States and Canada through four segments:  (1) The Art Institutes, including The Art

Institute of New York City; (2) Argosy University; (3) Brown Mackie Colleges; and (4) South

University.  In or around January 2016, EDMC announced that it would be closing The Art

Institute of New York City.  In or October 2017, EDMC completed a sale of assets, including

The Art Institute of New York City, to Dream Center Los Angeles, a philanthropic foundation.

9.      Defendant The Art Institute of New York City was EDMC's New York campus

located at 218-232 West 40th Street in Manhattan, and at all relevant times was wholly owned,

either directly or indirectly, by EDMC.   It is no longer in operation.

10.      Defendant the Accrediting Council For Independent Colleges and Schools

("ACICS") is a non-profit education corporation located at 750 First Street, NE, #980,

Washington, D.C. 20002.  ACICS was formerly recognized by the United States Department of

Education as an independent and autonomous national accrediting body.

11.      Edward H. West ("West") was at all relevant times, the President and Chief

Financial Officer of EDMC from December 2008 until August 2012, and the President, Director

and Chief Executive Officer from August 2012 until 2015.  He became a member of EDMC's

board of directors in October 2012.

12.      John M. Mazzoni ("Mazzoni") was at all relevant times until his termination on

June 20, 2013, the Senior Vice President of Operations of EDMC and the President of The Art

Institutes.

13.      Todd S. Nelson ("Nelson") was at all relevant times until his termination on

November 1, 2013, was the former Chief Executive Officer and the Chairman of the Board of

Directors of EDMC.  Prior to holding these positions at EDMC, Mr. Nelson served as President, then CEO and Chairman of the Apollo Group ("Apollo"), which runs the for-profit school, the University of Phoenix.  During Mr. Nelson's tenure at the head of Apollo, the company paid $9.8 million to settle charges brought by the U.S. Department of Education concerning predatory admissions practices at the University of Phoenix, including violations of the incentive compensation ban and other government regulations.  Mr. Nelson was pushed out of Apollo by the company's founder, John Sperling, in January 2006.

## JURISDICTION AND VENUE

14.    This Court has jurisdiction over this action pursuant to the Class Action Fairness Act of 2005 ("CAFA"), Pub. L. No. 109-2, 119 Stat. 4 (codified in various sections of 28 U.S.C.)

15.    Plaintiff De La Cruz is a resident of New York, Plaintiff Bennett is a resident of Pennsylvania, and Plaintiff Ortiz is a resident of New Jersey.  At all relevant times, the EDMC Defendants, the Art Institute of New York City, and ACICS have been registered to do business in New York.  Defendant West is a resident of Texas, Defendant Nelson is a resident of Illinois, and Defendant Mazzoni is a resident of Pennsylvania, but during the relevant time period, Defendants West, Nelson, and Mazzoni transacted business in New York.  The amount in controversy exceeds $5,000,000 and there are at least one hundred members of the putative class.

16.    This Court has jurisdiction over Defendants because they either are foreign corporations authorized to conduct business in New York, are doing or did business in New York during the relevant time period and have registered with the New York Secretary of State, or do sufficient business in New York, have sufficient minimum contacts with New

York, or otherwise intentionally avail themselves of the New York consumer market through the accreditation, promotion, marketing, sales, and providing of for-profit education programs, including the Art Institute of New York City, in New York.  This purposeful availment renders the exercise of jurisdiction by this Court over Defendants and their affiliated or related entities permissible under traditional notions of fair play and substantial justice.

17.    In addition, this Court has subject-matter jurisdiction under CAFA because the amount in controversy exceeds $5 million and diversity exists between Plaintiffs and the Defendants.  28 U.S.C. § 1332(d)(2).  Further, in determining whether the $5 million amount in controversy requirement of 28 U.S.C. § 1332(d)(2) is met, the claims of the putative class members are aggregated.  28 U.S.C. § 1332(d)(6).

18.    Venue is proper in this forum pursuant to 28 U.S.C. § 1391 because Defendants transact business and may be found in this District and a substantial portion of the practices complained of herein occurred in the Southern District of New York.

19.    All conditions precedent to this action have occurred, been performed, or have been waived.

**Statement of Facts**

20.    For for-profit schools like EDMC, enrollment growth is critical to business success.  In order to meet revenue expectations, EDMC was required to recruit and enroll as many students as possible.  However, EDMC's enrollment practices must comply with Title IV regulations, including Program Integrity Rules regarding compensation of admissions representatives and disclosure of information related to program requirements and costs, accreditation, and graduation and job placement statistics.

21.     EDMC has generated most of its revenue from Title IV federal funding, such as the Pell grant and Stafford loan programs, which help students pay for higher education. In or around 2006, EDMC launched an aggressive growth campaign to enroll new students at all costs and above all other considerations. The EDMC "admissions staff," comprised primarily of career salespeople rather than persons with backgrounds in higher education and guidance counseling, grew from 950 to 2,600 nearly overnight. Enrollment numbers soared, and Title IV money poured in to EDMC. From 2011 to 2015, EDMC collected over $8 billion from Title IV programs, amounting to approximately 77% of EDMC's net revenues.

22.     To receive Title IV funding, EDMC must comply with regulatory requirements. In October 2010, the Department of Education ("DOE") adopted new regulations effective July 1, 2011, to improve the integrity of programs authorized to receive Title IV funding. The Program Integrity Rules adopted by the DOE established new compliance requirements, including (i) requiring disclosure of graduation and job placement rates; (ii) instituting policies to track student academic progress; and (iii) clarifying minimum requirements for state authorization of postsecondary programs. Additionally, the Program Integrity Rules redefined what constitutes a "substantial misrepresentation" in connection with statements made to prospective students and strengthened the DOE's authority to take action against institutions engaged in deceptive advertising, marketing and sales practices.

23.     The Program Integrity Rules also created a "gainful employment" rule designed to provide students with better information about the value of programs and whether they lead to gainful employment in recognized occupations. The rule required calculation of statistics concerning costs, debt levels, job placement rates, and earnings post-graduation. Defendants

made materially false and misleading public statements concerning the job placement and earnings of its graduates to satisfy these requirements and obtain Title IV funding.

**DEFENDANTS' FALSE AND MISLEADING STATMENTS**

24.     At all relevant times, EDMC has marketed itself as a career-focused school and entices students to enroll by offering the prospect of better jobs and higher wages.  To market its programs, EDMC has used job placement data to lure students, as well as to satisfy regulators and accrediting agencies that the schools are performing adequately, and to maintain access to Title IV funding.

25.     Pursuant to the Higher Education Act ("HEA"), institutions like EDMC "must make available to any enrolled student or prospective student through appropriate publications, mailings or electronic media, information concerning . . . . [t]he placement of, and types of employment obtained by, graduates of the institution's degree or certificate programs, . . . The institution must identify the source of the information provided in compliance with this paragraph, as well as any time frames and methodology associated with it." 34 C.F.R. § 41.  In addition, "[t]he institution must disclose any placement rates it calculates." *Id*.

26.     Furthermore, the DOE requires "for-profit" institutions like EDMC to obtain state authorization and accreditation to be eligible for Title IV funding.   The Accrediting Council for Independent Colleges and Schools ("ACICS"), which accredit most of the EDMC's Art Institute campuses, require each accredited institution to maintain a benchmark employment rate of 65% for programs longer than one year.  Failure to meet this benchmark may result in loss of Title IV funding.

27.     Because of the reporting requirements imposed on EDMC by these rules and regulations, and to maintain Title IV funding, Defendants consistently manipulated and

misrepresented The Art Institute of New York City's job placement rates for graduates and career placement services.

28.     During their tenure with EDMC and The Art Institutes, Defendants West, Mazzoni and Nelson held positions of control and authority as senior officers and were able to, and did, control the contents of various reports, press releases, public filings, and marketing brochures and advertisements for EDMC and The Art Institute of New York City.  Throughout the Class Period, Defendants West, Mazzzoni and Nelson exercised their power and authority to cause EDMC and The Art Institute of New York City to engage in the wrongful acts and fraudulent representations set forth herein.  Defendants West, Mazzoni and Nelson each exercised control over the general operations of EDMC and The Art Institute of New York City and possessed the power to control the specific activities which comprise the primary violations set forth in this Complaint.   As officers and/or directors of a publicly owned company, Defendants West, Mazzoni and Nelson had a duty to disseminate accurate and truthful information with respect to EDMC's and The Art Institute of New York City's operations, including graduate placement rates and statistics and career placement services, and to correct promptly any public statements which were materially false and misleading.  However, Defendants West, Mazzoni and Nelson disseminated false and misleading information concerning graduate placement rates and statistics and career placement services as part of a larger fraudulent scheme to increase student enrollment and enhance their own compensation.

29.     On August 30, 2011, EDMC filed its annual report on Form 10-K with the SEC for the fiscal year ended June 30, 2011, and therein stated the following regarding its job placement statistics:

Graduate Employment

9

> We measure our success as an educator of students to a significant extent by the ability of our students to find jobs in their chosen field of employment upon graduation from our schools. Most of our schools provide career development instruction to our students in order to assist the students in developing essential job-search skills. In addition to individualized training in interviewing, networking techniques and resume writing, most of our schools require students to take a career development course. Additionally, we provide ongoing employment resources to our undergraduate students and recent graduates. Career services departments also assist current students in finding part-time employment while attending school. Students in certain of our Doctorate programs spend up to a year in a paid internship in their chosen field.
>
> * * *
>
> Based on information collected by us from graduating students and employers, we believe that, of the approximately 18,200 undergraduate students who graduated from our schools other than Argosy University during the calendar year ended December 31, 2010, approximately 82% of the available graduates obtained employment in their fields of study, or in related fields of study, within six months of graduation.

30.     These same representations were made to Plaintiffs and other students by EDMC and The Art Institute of New York City, at the direction, and under the control and authority, of Defendants West, Nelson and Mazzoni, in marketing brochures and advertisements which promoted the school to students like Plaintiffs and other members of the Class in or around the Summer of 2011.  Plaintiffs and other similarly situated students were told by The Art Institute of New York City that 80% of the graduating class had jobs in their field of study, but Plaintiffs came to learn much later, *i.e.*, in or around December 2015, that only 30% of students who enroll at The Art Institute of New York actually graduate. When deciding whether to enroll and remain enrolled in The Art Institute of New York City, Plaintiffs and other members of the Class relied on Defendants' statements concerning graduate job placement rates and salaries and job placement services provided by the school.

31.     In addition, in a brochure circulated to potential students, including Plaintiffs and other students, The Art Institute of New York City, at the direction, and under the authority and control, of Defendants West, Nelson and Mazzoni, made the following representations

10

concerning graduates' job placement rates and average annual salary in their field of interest, which were materially false and misleading:





## RE TURNING OPPORTUNITIES INTO CAREERS.

**Measuring our graduates' success.**
We've charted our recent grads' progress as they launch their careers, both in terms of finding jobs and in the salary they're earning.

| | Total Graduates | Number of Graduates Unavailable for Employment Within Six Months of Graduation | Number of Graduates Available for Employment Within Six Months of Graduation | Number of Graduates Employed | Percentage of Available Graduates Employed in Related Field | Average Salary |
|---|---|---|---|---|---|---|
| **Associate's Degree Programs** | | | | | | |
| Digital Filmmaking | 26 | 1 | 25 | 20 | 80.0% | $28,145 |
| Fashion Design | 70 | 14 | 56 | 48 | 85.7% | $25,094 |
| Graphic Design | 56 | 16 | 40 | 35 | 87.5% | $31,755 |
| Interior Design | 33 | 5 | 28 | 21 | 75.0% | $31,930 |
| Web Design & Interactive Media | 22 | 4 | 18 | 13 | 72.2% | $42,292 |
| Total Associate's Degree Programs** | 316 | 56 | 260 | 226 | 86.9% | $29,023 |
| **All Program Totals**/*** | 397 | 76 | 321 | 281 | 87.5% | $29,056 |

* Graduates available for employment excludes graduates who have waived employment assistance for one of the following reasons: medical condition that prevents full-time employment; active military duty; incarceration; death; non-immigrant status; furthering education with minimum of 50% credit load; stay-at-home parent; or continuation of employment in an unrelated field with current salary in excess of entry-level salary.

** Total includes employment activity for graduates of programs which are no longer offered to new students.

*** All Program Totals exclude new programs for which there were no graduates. For a complete list of available programs, please contact the Admissions Department.

Average salaries include, as applicable, annualized salary, overtime, payment for freelance assignments, hourly wages from multiple employments, and scheduled bonus payments. Graduates who have prior work experience and who are new to an employment field are included in the employment statistics. Data represents employment for January 1, 2009–December 31, 2009 graduates, six months after graduation.

32.     The Art Institute Of New York City, at the direction, and under the authority and control, of Defendants West, Nelson and Mazzoni, also represented in its brochures circulated to students and prospective students, including Plaintiffs and other members of the Class, that it was well connected with numerous potential employers, which was materially false:

By offering internship opportunities and helping to keep our education programs aligned with industry trends, many employers work with our schools to make our students more marketable.

And our system of over 45 schools across North America keeps us connected with employers all around the country.

33.    The Art Institute of New York City, at the direction, and under the authority and control, of Defendants West, Nelson and Mazzoni, further represented falsely in its brochures provided to students and potential students, including Plaintiffs and other members of the Class, that:

Of all 2009 graduates of The Art Institute of New York City available for employment, 87.5% were working in a field related to their program of study within six months of graduation, at an average starting salary of $29,056.

14

34.      The Art Institute of New York City, at the direction, and under the authority and control, of Defendants West, Nelson and Mazzoni, also represented to Plaintiffs and other students that the "Career Services staff  supports student's career planning efforts with tips and techniques that are proven to lead to successful job searches," that they would provide "help with job search skills, resume, writing, interviewing and networking", "help pursuing full-time work after graduation,"  "a Portfolio Show attended by potential employers,"  "opportunities to meet employers at career days, internships and job fairs," and "current insights into the skills employers are looking for in candidates."  However, not one single potential employer or company in the field of Digital Media attended the show in May 2014.  The Art Institute of New York City, at the direction, and under the authority and control, of Defendants West, Nelson and Mazzoni, also represented to Plaintiffs that it hosted two job fairs per year for students and that potential employers for Digital Media would be in attendance at these job fairs, but there were no potential employers for Digital Media who attended these job fairs.  In addition, The Art Institute of New York City represented that its graduates had obtained positions with specific high profile employers in their fields of interest, when this was not true:



## Helping student evolve into professionals

Our Career Services staff supports student's career planning efforts with tips and techniques that are proven to lead to successful job searches. We have contracts in your community and throughout North America. So no matter where our grads want to start their careers, we're right there behind them.

### We provide:

+ help with job search skills, resume writing, interviewing, and networking

+ help finding part-time work while still in school

+ help pursuing full-time work after graduation

+ a Portfolio Show attended by potential employers

+ opportunities to meet employers at career days, internships, and job fairs

+ current insights into the skills employers are looking for in candidates

### Employers inspired to hire our grads

Graduates of The Art Institute of New York City have recently found employment in some of the most prominent companies in the region and beyond, including:

+ FASHION DESIGN
Perry Ellis
Harper's Bazaar
Pow Wow USA
Louise Paris
Planet Lingerie
Federal Jeans

+ VIDEO PRODUCTION
Tribeca Cinemas
Play Pusher
World Wide Audio
Telecare
Dogmatic
Universal

+ INTERIOR DESIGN
Home Depot x 2
David Easton
Alexander Hirsch BPD
Chandani Design
Disegno by James Dipersia
Ethan Allen

+ GRAPHIC DESIGN
Marvel Entertainment
Film Society of Lincoln Center
Merrill Corp.
Major League Soccer
Random House
Phoenix Design Works

+ WEB DESIGN & INTARACTIVE MEDIA
Apple
Structured Web
7One8
Expand The Room
NJPAC
Verrex

## TRANSFORMING FUTURES!

35.     The Art Institute of New York City, at the direction, and under the authority and control, of Defendants West, Nelson and Mazzoni, also represented:

**You can judge our grads by the companies that hire them.**

Here are just a few of the high-profile employers, both local and around the country, who have hired recent graduates of The Art Institute of New York City.

| | | |
|---|---|---|
| • Apple | • Easy Going Home | • Next USA |
| • Armani Casa | • Ecko Enterprises | • NY 1 News |
| • Astor & Black | • Ethan Allen | • Sean John |
| • Axis 360 | • Euro RSCG | • Sony Music |
| • Brooks Brothers | • Freeze CMI | • The Home Depot |
| • Cablevision News 12 | • G2 Direct & Digital | • Tribeca Cinemas |
| • Chelsea Pictures | • Grey NYC | • United Colors of Benetton |
| • Children's Apparel Network | • H&M | • Victoria's Secret |
| • Christopher Coleman Design | • InStyle Magazine | • Wee Play Kids |
| • Cline Davis & Mann | • JWT | • West Elm |
| • Custo Barcelona | • Lincoln Center | |
| • Dogmatic | • McGarry Bowen | |

**When you're ready to look, you'll find plenty of support.**

As our grads start their job search, they can count on the support of our Career Services staff. We provide helpful tips and techniques, and connect them to hiring managers in their community and throughout North America.

**We'll help:**

• Develop job-search skills in resumé writing, interviewing, and networking
• Find part-time work while in school
• Pursue full-time work after graduation

**Students can also take advantage of:**

• A Portfolio Show during final quarter attended by potential employers
• Opportunities to meet employers at career days and job fairs
• Current insights into the skills employers are looking for

**Start here. And go as far as your talent takes you.**

These aren't just job titles. They're opportunities that some of our recent grads have taken hold of.

| DESIGN | MEDIA ARTS | FASHION |
|---|---|---|
| • Assistant Interior Designer | • A/V Technician | • Assistant Designer |
| • AutoCAD Draftsperson | • Assistant Producer | • Pattern Maker |
| • Graphic Designer | • Camera Operator | • Sales Associate |
| • Junior Art Director | • Film or Video Editor | • Showroom Assistant |
| • Layout Artist | • Flash Designer | • Visual Merchandiser |
| • Print Production Artist | • Interactive Media Designer | • Wardrobe Stylist |
| • Project Designer | • Multimedia Designer | |
| • Space Planner | • Production Assistant | |
| • Technical Director | • Website Designer | |

36.     In addition, The Art Institute of New York City, at the direction, and under the authority and control, of Defendants West, Nelson and Mazzoni, also represented in writing, to students including Plaintiffs and other members of the Class that its Career Services offered Digital Filmmaking students with valuable internships at prestigious companies, when this also was not true:



# Internship Sites

## Fashion Design

Luca Luca
Cusro Barcelone
Kai Kuhne
Betsey Johnson
Bill Blass
Black Dog 8, LLC
Twinkle by Wenlan
Showroom Seven

Signature Apparel
The Tyra Banks Show
Donna Karan
Eugenia Kim
Vera Wang
Indigo Handloom
Jill Stuart
Kai Kuhne

Pure Accessories
Melinda Eng
New Direction Showroom
Ann Taylor Loft
Planet Lingerie
Ouch! Magazine
Tommy Hilfiger

## Graphic Design

A&M Octone Records
AJ Design
Alex and Sam
Chloe & Reese
Cozi Bug
Crystal McKenzie Inc.
Drew's List
Emperor's New Clothes
Esquire Magazine
Essence Magazine
First Star Pictures

Food Network Magazine
Future Kicks
G2 Direct & Digital
Gigapixel Creative
Ideal Media, LLC
Langton Cherubino Group
Malbon Bros. Farms
Metro Ink
NAF Studio
NY Botanical Garden

Paul Stuart
Phoenix Design Works
Red Cow Productions
Revolver Magazine
The News Market
UnVogue Magazine
Vertic Portals
Warner Music Group
Women's Wear Daily

## Web Design & Interactive Media

ABC Carpet
American Theater of Actors
At Home USA
Blue Suitcase
Brickhouse Security

Clear Channel Radio
First Line Entertainment
Gigapixel Creative
In Record Time
MTV

NY Botanical Garden
Strawberry Frog
The News Market
This Old House Magazine

## Interior Design

Artistic Tile
Berceli
Bjornsson Design
Chandani Design
Chien Dao Studio

Cooper Carey Architects
David Howell Design
Donghia
Inarch ID
Jo Laurie Design

Moura Starr
Perianth Interior Design
Robert Allen Group
Beacon Hill
Robin Baron Design Inc.

## Digital Filmmaking

*Tribeca film festival*

B Productions
Bergen County Technical
Citystage
Cristina Buccola
Dream Hygh Entertainment
Enviro Live Media

Flud Watches
Fuse TV
Jeskid Productions
Made in NY
NBC Universal
Nova Entertainment

Original Media
Pegasus Education
Plenty Cash Flow Entertainment
Right Angle Studios
The Station Media
*Scout Production, QueenEye for a Guy, Straight*

*Mega Play group / Atlantic Records / Flud Watches / MTV*
*TA... Orti. PG. 13*

37.    Plaintiffs and other similarly situated students relied on these false and misleading statements when deciding to enroll in The Art Institute of New York City and when deciding to

continue their enrollment and obtain a degree. Unbeknownst to Plaintiffs and other similarly situated students at the time of their initial and continued enrollment at The Art Institute of New York City was that all of these statements were materially false and misleading. These career and job placement services were not provided to Plaintiffs by the school and the job placement data was fabricated in order for the school to meet certain guidelines to obtain Title IV funding.

38.    In addition to making numerous false and misleading statements to Plaintiffs and other similarly situated students concerning its career placement programs and its graduates' job placement and salaries in their chosen fields, The Art Institute of New York City failed to provide meaningful instruction to its students enrolled in Digital Film Making. Indeed, the cameras provided by The Art Institute of New York City were outdated HVX Panasonic 2001 cameras, and the students were instructed in 2011 through 2014 on this outdated equipment. Receiving instruction on severely outdated equipment put Plaintiffs and other students at a great disadvantage when applying for jobs in digital filmmaking.

39.    There was not enough film equipment for the students, including Plaintiffs, to work on projects and much of the film equipment was broken and unusable. For example, much of the sound equipment and microphones did not work. Plaintiffs, moreover, paid a substantial sum of money to cameras that were ten years old and P2 cards, when the film industry does not use the ten year old cameras and P2 cards.

40.    There were very few computers available to Plaintiffs and other students enrolled in the Digital Film Making program in the editing lab and the ones made available often lacked the film editing software. The Art Institute of New York City failed to provide Plaintiffs and other students enrolled in the Digital Film Making program with editing software for their own

computers. The lack of resources and outdated equipment made it difficult for Plaintiffs and other students to complete projects or learn skills relevant in the current job market.

41.    At some point in time during Plaintiffs' enrollment in Digital Film Making at The Art Institute of New York City, the school knew that it was no longer going to offer the Digital Film Making program. The Art Institute of New York City, however, failed to inform Plaintiffs and other students that this program would soon be discontinued (and thus, a degree in the program would be worth next to nothing) and continued to recruit new students for the Digital Film Making Program.

42.    In August 2011, unbeknownst to Plaintiffs, EDMC received a subpoena from the Attorney General of the State of New York requesting documents related to EDMC's compensation of admissions representatives and student recruiting activities.

43.    In July 30, 2012, unbeknownst to Plaintiffs, Senator Tom Harkin, chairman of the Health, Education, Labor and Pensions Committee, completed a two-year investigation of the for-profit college industry and issued a report (the "Harkin Report"). According to the Harkin Report, EDMC's aggressive lending and recruiting practices resulted in a student body that is unable to obtain gainful employment and laden with a significant amount of debt. The Art Institute of New York City knew at this time, and failed to disclose to its students, that EDMC's aggressive lending and recruiting practices resulted in a student body that was unable to obtain gainful employment and laden with a significant amount of debt. Had Defendants and the Art Institute of New York City disclosed this material information to its students, it is likely that Plaintiffs and other similarly situated students would not have continued their enrollment.

44.    Defendants West, Nelson and Mazzoni continued to provide false information concerning EDMC's graduates' job placement statistics as part of an overall scheme to increase

federal funding and federal student loans, and thereby increase student enrollment at EDMC's

for-profit schools, including The Art Institute of New York City. The greater availability of

federal funding for student loans meant more students enrolling in and attending The Art

Institute of New York City and other EDMC for-profit schools. The greater the enrollment

number at the EDMC for-profit schools, the higher the price of EDMC's common stock and the

larger the annual compensation packages of Defendants West, Nelson, and Mazzoni. As

President of The Art Institutes, Mazzoni ensured that the fraudulent information concerning

graduate placement statistics and career placement services for the EDMC for-profit schools was

reflected uniformly in the advertising materials and brochures of The Art Institute of New York

City, which were provided to Plaintiffs and other members of the Class.

45.     On October 27, 2011, EDMC hosted a conference call to discuss fiscal results for

the quarter ending September 30, 2011. During this call, Defendant Nelson stated, in part:

> Of our undergraduate students, excluding Argosy University, excluding Argosy
> University, available for employment who graduated during the quarter ended this past
> March, approximately 80% were employed in their fields and related fields within 6
> months to graduation.

46.     These representations of Defendant Nelson were materially false and misleading

because, as set forth herein, the graduation job placement statistics had been falsified as part of

an overall fraudulent plan of Defendants West, Nelson, and Mazzoni to increase federal funding

and student loans and to increase student enrollment at The Art Institute of New York City and

other EDMC for-profit schools. This, in turn, would and did increase the common stock price of

EDMC and the compensation packages of Defendants West, Nelson and Mazzoni. These same

false representations concerning graduate job placement rates in the graduates' chosen field of

study were repeatedly made to Plaintiffs by The Art Institute of New York City, at the direction

of, and under the domination and control by, Defendants West, Nelson, and Mazzoni. These

false representations were made in brochures and marketing materials made available to students at The Art Institute of New York City, in or around October 2011 and throughout the Fall semester 2011. Plaintiffs and other members of the Class relied on these statements concerning graduate job placement statistics in the chosen field of study when deciding whether to enroll and maintain enrollment at The Art Institute of New York City and work towards graduating and obtaining a degree.

47.    On February 2, 2012, EDMC hosted a conference call to discuss fiscal quarter results for the period ending December 31, 2011. During the conference call, Defendant Nelson stated, in part:

> I'd like now to provide a brief update of our graduate statistics -- of our undergraduate students excluding Argosy University available for employment who graduated during the quarter ended this past year, approximately 76% were employed in their fields or related fields within six months of graduation.

48.    These representations of Defendant Nelson were materially false and misleading because, as set forth herein, the graduation job placement statistics of EDMC's for-profit schools, including The Art Institute of New York City, had been falsified as part of an overall fraudulent plan of Defendants West, Nelson, and Mazzoni to increase federal funding and student loans in order to increase student enrollment at The Art Institute of New York City and other EDMC for-profit schools. This, in turn, would and did increase the price of the common stock of EDMC and the annual compensation packages of Defendants West, Nelson, and Mazzoni. These same false representations concerning graduate job placement rates in the graduates' chosen field of study were repeatedly made to Plaintiffs by The Art Institute of New York City, at the direction of, and under the domination and control by, Defendants West, Nelson, and Mazzoni. The false representations were made in brochures and marketing materials made available to students at The Art Institute of New York City, in or around

22

February 2012 and throughout the Spring of 2012. Plaintiffs and other members of the Class

relied on these statements concerning graduate job placement when deciding whether to enroll

and/or continue with their enrollment at The Art Institute of New York City and work towards

graduating and obtaining a degree.

49.     On May 3, 2012, EDMC hosted a conference call to discuss fiscal quarter results

for the period ending March 31, 2012. During the conference call, Defendant Nelson stated, in

part:

> Of our undergraduate students, excluding Argosy University, available for employment
> that graduated during the first quarter – excuse me, during the quarter ended this past
> September (sic) [March], approximately 75% were employed in their fields or related
> fields within 6 months of graduation.

50.     These representations of Defendant Nelson were materially false and misleading

because, as set forth herein, the graduation job placement statistics of EDMC's for-profit

schools, including The Art Institute of New York City, had been falsified as part of an overall

fraudulent plan of Defendants West, Nelson, and Mazzoni to increase federal funding and

student loans in order to increase student enrollment at The Art Institute of New York City and

other EDMC for-profit schools. This, in turn, would and did increase the price of the common

stock of EDMC and the annual compensation packages of Defendants West, Nelson, and

Mazzoni. These same false representations concerning graduate job placement rates in the

graduates' chosen field of study were repeatedly made to Plaintiffs by The Art Institute of New

York City, at the direction of, and under the domination and control by, Defendants West,

Nelson, and Mazzoni. The false representations were made in brochures and marketing

materials made available to students at The Art Institute of New York City, in or around May

2012 and throughout the Spring semester 2012. Plaintiffs and other members of the Class relied

on these statements concerning graduate job placement when deciding whether to enroll and/or

continue with their enrollment at The Art Institute of New York City and work towards

graduating and obtaining a degree.

51.    On August 9, 2012, the Company hosted a conference call to discuss fiscal results

for the quarter and annual results for the period ending June 30, 2012.  During the conference

call, Defendant Nelson states, in part:

> [W]e are pleased with the success our graduates have in the job market for graduation.
> Based on the Gainful Employment Program data provided by the Department of
> Education for completers, from fiscal years 2007 and 2008, the graduates from our
> programs in calendar year 2010 earn an approximately 5% more on average than the
> graduates from all other institutions measured that offer the same programs. . . . Our
> undergraduates students excluding Argosy University available for employment and
> graduated during the quarter ended this past December, approximately 75% were
> employed in their fields or related fields within six months of graduation.

52.    These representations of Defendant Nelson were materially false and misleading

because, as set forth herein, the graduation job placement statistics of EDMC's for-profit

schools, including The Art Institute of New York City, had been falsified as part of an overall

fraudulent plan of Defendants West, Nelson, and Mazzoni to increase federal funding and

student loans in order to increase student enrollment at The Art Institute of New York City and

other EDMC for-profit schools.  This, in turn, would and did increase the price of the common

stock of EDMC and the annual compensation packages of Defendants West, Nelson, amd

Mazzoni.   These same false representations concerning graduate job placement rates in the

graduates' chosen field of study were repeatedly made to Plaintiffs by The Art Institute of New

York City, at the direction of, and under the domination and control by, Defendants West,

Nelson, and Mazzoni.  The false representations were made in brochures and marketing

materials made available to students at The Art Institute of New York City, in or around August

2012.  Plaintiffs and other members of the Class relied on these statements concerning graduate

job placement when deciding whether to enroll and/or continue with their enrollment at The Art

Institute of New York City and work towards graduating and obtaining a degree.

53.    On September 12, 2012, EDMC filed is annual report for the period ending June

30, 2012, on Form 10-K with the SEC (the "2012 Annual Report"), which was signed by

Defendant West, and therein continued to make false and misleading statements concerning its

career services and job placement programs, including the following statement: "[O]ur staff of

trained, dedicated career services specialists maintain strong relationships with employees in an

effort to improve our graduate employment rates for our students in their chosen fields."   EDMC

also claimed:

> [W]e provide ongoing employment resources to our undergraduate students and recent
> graduates.  Many career services departments also assist current students in finding part-
> time employment while attending school. . . . As of June 30, 2012, the career services
> departments of our school had approximately 310 full-time employees. We estimate that
> our career services departments maintain contact with approximately 70,000 employers
> nationwide.  . . . Based on information collected by us from graduating students and
> employers, we believe that, of the approximately 22, 300 undergraduate students who
> graduated from our schools. . . . during the calendar year ended December 31, 2011,
> approximately 77% of the available graduates obtained employment in their fields of
> study, or in related fields of study, within six months of graduation.

54.    These representations of EDMC were materially false and misleading because,

as set forth herein, the graduation job placement statistics of EDMC's for-profit schools,

including The Art Institute of New York City, had been falsified as part of an overall fraudulent

plan of Defendants West, Nelson, and Mazzoni to increase federal funding and student loans in

order to increase student enrollment at The Art Institute of New York City and other EDMC for-

profit schools.  This, in turn, would and did increase the price of the common stock of EDMC

and the annual compensation packages of Defendants West, Nelson, and Mazzoni.   These same

false representations concerning graduate job placement rates in the graduates' chosen field of

study, the career placement services provided by the EDMC for-profit schools, and the

relationships the career placement employees maintained with employers were repeatedly made to Plaintiffs by The Art Institute of New York City, at the direction of, and under the domination and control by, Defendants West, Nelson, and Mazzoni.  The false representations were made in brochures and marketing materials made available to students at The Art Institute of New York City, in or around September 2012.  Plaintiffs and other members of the Class relied on these statements concerning job placement statistics, career placement services and contacts with potential employers when deciding whether to enroll and/or continue with their enrollment at The Art Institute of New York City and work towards graduating and obtaining a degree.

55.     On November 1, 2012, EDMC hosted a conference call to discuss fiscal quarter results for the period ending September 30, 2012.  On this call, Defendant West represented the following:  "Of our undergraduate students who graduated during the quarter ended March 31 from our colleges and universities, . . . and were eligible for employment, approximately 76% became employed in their fields or related fields of study within 6 months of graduation with an average starting salary of approximately $30,100."

56.     These representations of Defendant West were materially false and misleading because, as set forth herein, the graduation job placement statistics of EDMC's for-profit schools, including The Art Institute of New York City, had been falsified as part of an overall fraudulent plan of Defendants West, Nelson, and Mazzoni to increase federal funding and student loans in order to increase student enrollment at The Art Institute of New York City and other EDMC for-profit schools.  This, in turn, would and did increase the price of the common stock of EDMC and the annual compensation packages of Defendants West, Nelson, and Mazzoni.   These same false representations concerning graduate job placement rates in the graduates' chosen field of study and average starting salaries of approximately $30,000, were

repeatedly made to Plaintiffs by The Art Institute of New York City, at the direction of, and

under the domination and control by, Defendants West, Nelson, and Mazzoni.  The false

representations were made in brochures and marketing materials made available to students at

The Art Institute of New York City, in or around November 2012.  Plaintiffs and other members

of the Class relied on these statements concerning graduate job placement when deciding

whether to enroll and/or continue with their enrollment at The Art Institute of New York City

and work towards graduating and obtaining a degree.

      57.     On January 31, 2013, EDMC hosted a conference call to discuss fiscal quarter

results for the period ending December 21, 2012.  During the conference call, Defendant West

represented, in part:

> During the first six months of fiscal 2013, we had approximately 15,000 graduates, up
> slightly versus the prior year.  Of our graduate students who graduated during the – of our
> undergraduate students who graduated during the quarter ended June 30, 2012 from all of
> our colleges and universities and were available for employment are approximately 74%
> became employed in their fields or related fields of study within six months of graduation
> with an average starting salary of approximately $30,000.

      58.     These same false representations were made by the Art Institute of New York,

under the direction and control, and with the approval, of Defendants West, Nelson, and Mazzoni

to Plaintiffs and other members of the Class.  These false representations were made in brochures

and pamphlets provided to enrolled students concerning the job placement rates and starting

salaries of the graduates from The Art Institute of New York City in or around January 2013.

Plaintiffs and other students relied on these statements when deciding whether to continue their

enrollment at The Art Institute of New York City and work toward obtaining their degrees.

      59.     On May 2, 2013, EDMC hosted a conference call to discuss fiscal quarter results

of the quarter ended March 31, 2013.  During the conference call, Defendant West stated, in part:

> During the first 9 months of fiscal 2013, we have had over 20,000 graduates, up slightly versus the prior year. Of our undergraduate students who graduated during the quarter ended September 20, 2012, from all of our colleges and universities and were available for employment, approximately 75% became employed in their fields or related fields of study within 6 months of graduation, with an average starting salary of approximately $29,200.

60.    These same false representations were made by the Art Institute of New York, under the direction and control, and with the approval, of Defendants West, Nelson, and Mazzoni to Plaintiffs, in brochures and pamphlets provided to students concerning the job placement rates and starting salaries of the graduates from The Art Institute of New York City in or around May 2013. Plaintiffs and other students relied on these false statements when deciding whether to enroll and/or continue their enrollment at The Art Institute of New York City and work toward obtaining their degrees.

61.    On August 8, 2013, EDMC hosted a conference call to discuss fourth quarter fiscal results for the period ending June 30, 2013. During the call, Defendant West represented that "approximately 76% of [graduates] secured employment in their fields or related fields of study within 6 months of graduation, with an average starting salary of approximately $30,000."

62.    These same false representations were made to Plaintiffs and other similarly situated students, by The Art Institute of New York City, at the direction and control, and with the approval, of Defendants West, Nelson, and Mazzoni to Plaintiffs, in brochures and pamphlets provided to students concerning the job placement rate and starting salaries of the graduates from The Art Institute of New York City in or around August 2013 and throughout the Fall 2013 semester. Plaintiffs and other members of the Class relied on these statements when deciding whether to enroll and/or continue their enrollment at The Art Institute of New York City and work toward obtaining their degrees.

63.     On October 31, 2013, EDMC hosted a conference call to discuss fiscal quarter results for the period ending September 30, 2013.  During the conference call, Defendant West stated, in part:

> Of our undergraduate students who completed their studies during the quarter ended March 31 of 2013 and were available for employment, approximately 77% secured employed in their fields or related fields of study within 6 months of graduation with an average starting salary of approximately $29,000.

64.     These same false representations were made to Plaintiff Ortiz and other members of the Class, by The Art Institute of New York City, at the direction and under the control, and with the approval, of Defendant West, Nelson, and Mazzoni, in brochures and pamphlets provided to students concerning the job placement rate and starting salaries of the graduates from The Art Institute of New York City in or around October 2013.  Plaintiff and other members of the Class relied on these false statements when deciding whether to enroll and/or continue enrollment at The Art Institute of New York City and work toward obtaining a degree.

65.     The above referenced statements by Defendants were materially false and misleading because the actual job placement rate was much lower than represented.  According to Jason Sobek, a former EDMC employee who filed a *qui tam* action against EDMC, students who failed to get jobs in their field of study were often omitted from job placement calculations in order to inflate the job placement statistics.  For example, Kacie Johnson, who completed an online associates degree in graphic design at the Art Institute, was never able to find a job in graphic design.  However, EDMC records show that Ms. Johnson was not included in job placement numbers, because she had an "established career" as an aide in a dialysis clinic.  Ms. Johnson, however, does not make enough to afford the $45,000 in student loans to EDMC.  Similarly, EDMC manipulated job placement statistics by defining "field related employment" very broadly and counting students as "employed" even if they had worked at a relevant job for

only one day.  For example, Tony Cavalline, a graduate of the Art Institute of Pittsburgh,

returned to the exact same position he held as a floral designer at a supermarket after graduation,

but was counted as a successful placement in the graphic design program.

66.      In addition, EDMC utilized estimated, rather than reported, salaries when

advising students about job prospects.  This had the effect of convincing students, like Plaintiffs,

to take on additional debt and remain enrolled based on the promise of future employment

opportunities.  Unbeknownst to Plaintiffs and the other students was that EDMC's interest in

student outcomes was limited to the extent they "counted" for statistical reporting requirements.

67.      Moreover, one witness interviewed in connection with a securities fraud class

action captioned, *Robb v. Education Management Corporation*, et al., 2:14-cv-01287 (W.D. PA),

included a former director of career services at the Art Institute of Pittsburgh from September

2011 to October 2012, who stated that EDMC was only focused on placement numbers without

regard to really delivering on the promise to improve students' career prospects.  As a result,

EDMC counted high salaried job placements as having met the federal government's

requirements dictating what counts as a placement within the student's field of study, even when

the job was in a field completely unrelated to the field of study.

### Plaintiffs' Post-Graduate Employment

68.      Plaintiff De La Cruz graduated in June 2013 from The Art Institute of New York

City with a degree as an Associate in Applied Science in Digital Filmmaking.   Since this time,

Plaintiff De La Cruz has applied for numerous jobs in his field or a related field, but has not

obtained employment in digital filmmaking nor earned an annual salary approaching $30,000.

Instead, Plaintiff De La Cruz currently is doing freelance work on his own, which he could have

done without attending The Art Institute of New York City.  Because of the false representations

30

made to Plaintiff De La Cruz by the Art Institute of New York City and/or EDMC concerning graduate placement rates, salaries, and employment statistics, Plaintiff De La Cruz has been saddled with significant debt for the loans he obtained in order to finance his studies at The Art Institute of New York City.

69.     Plaintiff Bennett completed her course work for a degree as an Associate in Applied Science in Digital Filmmaking from The Art Institute Of New York City in September 2013.   Since this time, Plaintiff Bennett has applied for numerous jobs in her field or a related field, but she has not obtained employment in digital filmmaking nor earned an annual salary approaching $30,000.  Instead, Plaintiff currently is working in a liquor store and earns minimum wage, which she could have done without attending The Art Institute of New York City. Because of the false representations made to Plaintiffs and other similarly situated students by the Art Institute of New York City and/or EDMC concerning graduate placement rates, salaries, and employment statistics, Plaintiff Bennett has been saddled with significant debt of approximately $112,000 for the loans she obtained in order to finance her studies at The Art Institute of New York City.

70.     Plaintiff Bennett's career advisor, Sara Patton, at The Art Institute of New York City solicited job placement data from Plaintiffs and repeatedly falsified and misrepresented the information provided by Plaintiff concerning her employment.  When Plaintiff graduated from The Art Institute of New York City in the Fall of 2013, Ms. Patton fabricated Plaintiff's job title, job responsibilities and salary.  After Plaintiff Bennett explained to Ms. Patton that her job and salary were quite different than Ms. Patton had represented, Ms. Patton stopped communicating with Plaintiff Bennett.

71.     Plaintiff Bennet has learned that The Art Institute of New York City was misappropriating student financial aid and using money ear marked for student aid to pay their employees' bonuses based on the number of students recruited to the school.

72.     Plaintiff Ortiz graduated in May 2014 from The Art Institute of New York City with a degree as an Associate in Applied Science in Digital Filmmaking.   Since this time, Plaintiff Ortiz has applied for at least seventy-three (73) jobs in his field or a related field and has not obtained employment in digital filmmaking nor earned an annual salary of $30,000.  Instead, Plaintiff Ortiz currently is employed by an insurance company and earns approximately $16,000 annually.  Plaintiff Ortiz has been saddled with significant debt of more than $155,000 for the loans he obtained to finance his studies at The Art Institute of New York City.

**The DOJ Settlement With EDMC**

73.     In November 2015, the United States Department of Justice and various individual States, including the State of New York, entered into a $102.8 million settlement agreement with Defendants to resolve claims arising from the action captioned, *The United States, et al v. Education Management Corporation, et al*, 2:07-cv-00461 (TFM)(W.D. PA) (the "US Action").  The US Action alleged that Defendants had made numerous false claims in order to participate in the federal student aid programs authorized pursuant to Title IV of the Higher Education Act of 1965, as amended, 20 U.S.C. § 1070 *et seq*, ("Title IV, HEA programs).  The US Action alleged that "EDMC's compensation system bases changes in admissions personnel compensation upon the number of students recruited by each admissions employee" in further violation of Title IV of the HEA's incentive compensation ban and that "EDMC has created a 'boiler room' style sales culture and has made recruiting and enrolling new students the sole focus." US Complaint ¶ 10.  The US Complaint alleged that, "EDMC instructs ADAs [Assistant

Directors of Admissions] that, when making a recruitment pitch to a student, the ADA should inform the potential student that EDMC schools have very high career placement percentages and that the Career Services Office will contact the student six (6) weeks prior to graduation and will set up interviews for the student with prospective employers.  However, in actuality, students themselves must initiate the process to receive the benefits of the Career Services Office.  In addition, students may use the Career Services Officer for a limited time after graduation, despite the fact that many ADAs tell students that they will have lifetime access to the Career Services Office."  US Complaint ¶ 107.

74.     On November 16, 2015, New York Attorney General Eric T. Schneiderman announced that he, along with 38 other state attorneys general and the District of Columbia, were part of the  US settlement with EDMC to reform recruiting and enrollment practices and forgive more than $102.8 million in outstanding loan debt held by more than 80,000 former students nationwide (the "Consent Judgment").[1]  Attorney General Schneiderman stated, "For profit education companies that lure students using deceptive recruitment and enrollment practices must be held accountable. . . . EDMC preyed on the hopes and dreams of New York students and ripped off taxpayers, who backed federal student loans that were destined to fail."  The Consent Judgment resolved claims by the New York Attorney General that EDMC had violated New York state consumer protection laws by:  (a) using deceptive and misleading student solicitations touting educational benefits that were available to too few EDMC students; (b) targeting

---

[1] To be eligible for debt relief, the EDMC student must have been enrolled in an EDMC program with fewer than 24 transfer credits, withdraw from EDMC within 45 days of the first day of their first term and their final day of attendance must have been between January 1, 2016 and December 31, 2014.  Unfortunately, Plaintiffs do not qualify because they maintained their enrollment at The Art Institute of New York City for more than 45 days after the first day of their first term and their final day of attendance was prior to December 31, 2014.

prospective students for high pressure recruitment, including many students EDMC knew or reasonably should have known would not likely benefit from an education at its institutions; (c) inaccurately claiming that certain of their programs were accredited by a programmatic accreditor necessary for a student to obtain licensure in their profession; and (d) misrepresenting job placement rates and graduation rates for students.  With regard to job placement, the New York Attorney General had found EDMC misrepresented graduates who worked only temporarily as having been "employed," based, for example, on a single day of work.  EDMC also misrepresented graduates as having been 'placed in field" although the employment in question was below that of the graduates' fields of study, such as a graduate with an Accounting diploma being counted as "placed in field" based upon employment as a cashier at a fast food restaurant.

75.     The Consent Judgment mandates that EDMC provide added disclosures to students, bars misrepresentations to prospective students, including prohibiting EDMC from making misrepresentations concerning graduation rates and placement rates, requires EDMC to reform its job placement rate calculations and disclosures to provide more accurate information about students' likelihood of obtaining sustainable employment in their chosen career, and institutes an extended period when new students can withdraw with no financial obligation.

**ACICS' Role In The Fraud**

76.     From 2009 through 2015, ACICS continued to grant accreditation to The Art Institute of New York City, despite numerous red flags which showed that ACICS knew, or reasonably should have known and failed to disclose, that the Art Institute of New York City and other EDMC for-profit schools simply did not deserve accreditation.  But for the accreditation of the ACICS, Plaintiffs and other students would not have enrolled, or maintained their enrollment,

34

in the Art Institute of New York City and would not have agreed to pay $30,000 in annual tuition, plus room and board.  Moreover, absent accreditation by a Department of Education - recognized accrediting agency, schools cannot obtain federal financial aid funding and students cannot obtain financial aid.  Thus, but for the accreditation by ACICS of the Art Institute of New York City, which ACICS knew or reasonably should have known was illegitimate because the Art Institute of New York City did not meet qualifications for accreditation, Plaintiffs and the other students would not have been able to obtain student loans and thus, would not be in debt.

77.    In September 2016, the Department of Education revoked its recognition of the ACICS after the National Advisory Committee on Institutional Quality and Integrity, a federal panel, recommended shutting down ACICS following strong criticism of its poor oversight.

78.    According to an "Inside Higher Ed" article published on June 13, 2016 at https://www.insidehighered.com/news/2016/06/13/much-stake-acics-and-accreditation-upcoming-federal-review, "Critics of ACICS, which accredits roughly 900 for-profit institutions, assert that the agency has done so little to rein in poorly performing institutions that it can no longer be viewed as a legitimate overseer of consumer protection and higher education quality."

79.    A report released by Senator Warren's office at http://www.warren.senate.go/files/documents/2016-6-10_ACICS_Report.pdf stated that "ACICS has spent years cranking open the spigot to allow taxpayer funds to flow to some of the sleaziest actors in American higher education. . . . ACICS has a history or accrediting schools that have faced investigations, penalties and settlements for violations of federal and state law. . . . Compared to institutions certified by other major accreditors, many ACICS accredited institutions consistently post some of the worst student outcomes in the country, measured by graduation rates, post enrollment earnings and debt burdens."

80.     Indeed, ACICS knew, or reasonably should have known, that on August 3, 2010, the United States Government Accountability office ("GAO") issued a report ("GAO Report") in connection with a hearing held by the Health, Education, Labor and Pensions Committee (the "HELP Committee") concluding that for-profit educational colleges such as EDMC had engaged in an illegal and fraudulent course of action designed to recruit students and overcharge the federal government for the cost of their education.  Thereafter, the HELP Committee launched an investigation of such practices; the U.S. Department of Education released data showing that the loan repayment rates for enrollees at thirteen campuses operated by EDMC were below the proposed threshold of 35 percent required for federal loan program eligibility and that enrollee default rates had significantly increased.  The GAO Report was a red flag to ACICS that the EDMC schools were not providing the quality of education worthy of accreditation.

81.     Moreover, ACSIS knew, or reasonably should have known, that in August 2011 the New York Attorney General commenced its investigation of EDMC and the Art Institute of New York City concerning the veracity of its representations of graduate job placement rates, salaries, and field of employment.  This too was another red flag and yet ACICS continued to grant accreditation to the Art Institute of New York City.  In addition, other branches of EDMC were also under investigation by regulators.  Nevertheless, ACICS did not revoke accreditation.

82.     Indeed, from 2010 to 2013, several other state authorities commenced investigations against EDMC and its for-profit schools, including the Attorney General's Office for the states of Colorado, Florida, Kentucky, Massachusetts and the City Attorney of the City of San Francisco.  Still, ACICS continued to grant accreditation to the Art Institute of New York City.

83.     On July 30, 2012, the Harkin Report was published and provided troubling

statistics and findings regarding EDMC's for-profit schools.  According to the Harkin Report,

EDMC's aggressive lending and recruitment practices resulted in a student body that is

underprepared, generally unable to obtain gainful employment and debt laden.  The Harkin

Report found that the programs offered by the Art Institutes of EDMC were costly and that

students completing these programs struggled to find jobs.  In addition, the EDMC for-profit

schools had some of the highest numbers of students leaving without completing a certificate or

degree. The report stated:

> Information EDMC provided to the committee indicates that of the 78,661
> students who enrolled at EDMC-owned colleges in 2008-2009, 62.1 percent, or
> 48840 students, withdrew as of mid-2010.  This is the fourth highest withdrawal
> rate of any company examined by the committee.  These students were enrolled a
> median of 4 months.  Further, a considerably higher percentage of students
> withdrew from EDMC compared to the overall withdrawal rate of 54 percent.
>
> EDMC's Certificate program has the highest withdrawal rate of all Certificate
> programs examined and is substantially higher than the sector-wide rate of 38.5
> percent.  EDMC's Associate and Bachelor's programs also rank amongst the ten
> highest withdrawal rates for both categories.  Additionally, EDMC's Bachelor
> degree withdrawal rate is significantly higher than the sector-wide rate of 54.3
> percent.

84.     The Harkin Report indicated that in response to the rising default rate of its

student borrowers, EDMC began a series of "default management" programs in an attempt to

prevent revocation of EDMC's Federal financial aid eligibility.  The default management

program, however, simply placed student loans on deferment and enabled EDMC to report the

loans as performing, when they were not.  The Harkin Report stated:

> It is likely that the reported default rates significantly undercount the number of
> students to ultimately face default, because of the companies' efforts to place
> students in deferments and forbearances.  Helping get delinquent students into
> repayment, deferment, or forbearance prior to default is encouraged by the
> Department of Education.  However, for many students forbearance serve only to

delay default beyond the 3-year measurement period the Department of Education uses to track defaults.

Default management is sometimes accomplished by putting students who have not made payments on their student loans into temporary deferments or forbearances.

***

EDMC, like may other for-profits colleges, contracted with the General Revenue Corporation (GRC), a subsidiary of Sallie Mae, to "cure" students who are approaching default.  In practice documents indicate that at many companies, nearly all "cures" are accomplished by deferment or forbearance, not by students actually repaying their loans.

Internal documents suggest that EDMC is taking aggressive action to manage their default rate.  "Get comfortable with doing a verbal forbearance!!!," instructs EDMC's Spring 2010 Default Prevention presentation.  The same presentation adds, "DON'T BE AFRAID- KEEP CALLING and KEEP CALLING LET THEM KNOW THIS IS NOT GOING TO GO AWAY" and that "It's time to be aggressive since we are now in a 3 year CDR window – defaults are likely to double/triple!!! Take action now!!"

***

Moreover, forbearances many not always be in the best interest of the student.  This is because during forbearance of Federal loans, as well as during deferment of unsubsidized loans, interest still accrues.  The additional interest accrued during the period of forbearance is added to the principal loan balance at the end of the forbearance, with the result that interest then accrues on an even larger balance.  Thus, some students will end up paying much more over the life of their loan after a forbearance or deferment.

85.     Despite these critical findings by the Harkin Report, ACICS continued to grant accreditation to the Art Institute of New York City, even though ACICS knew, or reasonably should have known, that the Art Institute of New York City did not meet the standards for accreditation.

86.     On March 22, 2013, EDMC filed a Form 8-K with the SEC, announcing that it received a subpoena from the Division of Enforcement of the SEC "requesting documents and information relating to the Company's valuation of goodwill and to its bad debt allowance for student receivables."  ACICS knew, or reasonably should have known about this Form 8-K and its negative impact on accreditation, yet took no steps to revoke accreditation of EDMC schools,

including the Art Institute of New York City.   Indeed, ACICS knew, or reasonably should have known, that the Art Institute of New York City did not meet the standards for accreditation.

87.     On May 17, 2013, EDMC filed a Form 8-K with the SEC announcing that it had received another subpoena from the Division of Enforcement of the SEC "requesting documents and information relating to the letters of credit the Company posted with the U.S. Department of Education and the Company's compliance with the U.S. Department of Education's standards of financial responsibility for participation in Title IV programs." ACICS knew, or reasonably should have known about this Form 8-K and its negative impact on accreditation, yet took no steps to revoke accreditation of EDMC schools, including the Art Institute of New York City and continued to grant accreditation to the Art Institute of New York City when it knew, or reasonably should have known, that it did not meet the standards for accreditation.

88.     On June 20, 2013, EDMC filed a Form 8-K with the SEC, announcing the termination of John M. Mazzoni, the President of the Art Institutes.  ACICS knew, or reasonably should have known about this Form 8-K and its negative impact on accreditation, yet took no steps to revoke accreditation of the Art Institute of New York City.   Indeed, ACICS knew, or reasonably should have known, that the Art Institute of New York City did not meet the standards for accreditation.

89.     One week later, On June 27, 2013, EDMC filed a Form 8-K with the SEC announcing the resignation of its Vice President, Controller and Chief Accounting Officer, Randall J. Killeen. ACICS knew, or reasonably should have known about this Form 8-K and its negative impact on accreditation, yet took no steps to revoke accreditation of the Art Institute of New York City.

90.     On November 1, 2013, EDMC filed a Form 8-K with the SEC, announcing the termination of its Chairman, Todd S. Nelson. ACICS knew, or reasonably should have known about this Form 8-K and its negative impact on accreditation, yet took no steps to revoke accreditation of EDMC schools, including the Art Institute of New York City.

91.     On January 24, 2014, EDMC filed a Form 8-K with the SEC, announcing that it had received inquiries from twelve states regarding its business practices and that the Attorney General of the Commonwealth of Pennsylvania would spear head the investigations concerning EDMC's "practices relating to the recruitment of students, graduation placement statistics, graduate certification and licensing results, and student lending activities, among other matters.' ACICS knew, or reasonably should have known about this Form 8-K and its negative impact on accreditation, yet took no steps to revoke accreditation of EDMC schools, including the Art Institute of New York City.   Indeed, ACICS knew, or reasonably should have known, that the Art Institute of New York City did not meet the standards for accreditation.   Moreover, at all relevant times, ACICS knew, or reasonably should have known, that Plaintiffs and other members of the Class would rely on ACICS's accreditation.

**Class Allegations**

92.     Plaintiffs bring this action against Defendants pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of himself and all other persons similarly situated.  Plaintiffs seeks to represent a Class of all persons who attended The Art Institute of New York City from 2009 through December 2015.

93.     Plaintiffs reserve the right to modify or amend the definition of the proposed class before the Court determines whether certification is appropriate.

94.     Defendants subjected Plaintiffs and the respective Class members to the same unfair, unlawful, and deceptive practices and harmed them in the same manner.

**B. Numerosity**

95.     The proposed class is so numerous that joinder of all members would be impracticable.   Hundreds of students attended the Art Institute of New York City from 2009 to December 2015.  The individual class members are ascertainable, as the names and addresses of all class members can be identified in the business records maintained by Defendants.   The precise number of class members can be obtained through discovery, but the numbers are clearly more than can be consolidated in one complaint such that it would be impractical for each member to bring suit individually.   Plaintiffs do not anticipate any difficulties in the management of the action as a class action.

**C. Commonality**

96.     There are questions of law and fact that are common to Plaintiffs' and class members' claims.

97.     These common questions predominate over any questions that go particularly to any individual member of the Class.   Among such common questions of law and fact are the following:

a. Whether the EDMC Defendants, The Art Institute of New York City and West made materially false and misleading statements concerning the quality of the education and the graduate job placement rates, salaries and fields of employment of students attending the Art Institute of New York City;

b.  Whether the false and misleading statements of EDMC and The Art Institute of New York City and West were made under the direction and control, and with the approval, of Defendants West, Nelson, and Mazzoni.

c.  Whether ACICS made materially false and misleading statements by granting the Art Institute of New York City accreditation, when it knew, or reasonably should have known, that it did not meet the standards for accreditation and knew, or reasonably should have known, that Plaintiffs and other class members would reasonably rely on its accreditation;

41

d. Whether Plaintiffs and other members of the Class reasonably relied on the material false and misleading statements of Defendants when deciding to enroll, maintain enrollment, and make tuition payments at The Art Institute of New York City;

e. Whether Defendants violated the consumer protection statutes of New York, New Jersey and Pennsylvania by making materially false and misleading statements concerning the accreditation and/or the quality of the education and the graduate job placement rates, salaries and fields of employment of students attending the Art Institute of New York City; and

f. Whether Plaintiffs and the Class are entitled to damages and/or injunctive relief as a result of Defendants' conduct.

### D. **Typicality**

98.    Plaintiffs are a member of the Class they seek to represent. Plaintiffs' claims are typical of claims of the other class members because of the similarity, uniformity, and common purpose of the Defendants' unlawful conduct. Each class member has sustained, and will continue to sustain, damages in the same manner as Plaintiffs as a result of Defendants' wrongful conduct.

### E. **Adequacy of Representation**

99.    Plaintiffs are adequate representatives of the class they seek to represent and will fairly and adequately protect the interests of that class. Plaintiffs are committed to the vigorous prosecution of this action and has retained competent counsel, experienced in litigation of this nature, to represent him. There is no hostility between Plaintiffs and the unnamed class members. Plaintiffs anticipate no difficulty in the management of this litigation as a class action.

100.    To prosecute this case, Plaintiffs have chosen the undersigned law firm which is very experienced in class action litigation and has the financial and legal resources to meet the substantial costs and legal issues associated with this type of litigation.

**F. Requirements of Fed. R. Civ. P. 23(b)(3)**

101.     The questions of law or fact common to Plaintiffs' and each Class Member's claims predominate over any questions of law or fact affecting only individual members of the class.   All claims by Plaintiffs and the unnamed class members are based on Defendants material false and misleading statements concerning accreditation, educational quality, and graduate placement statistics for students at the Art Institute of New York City.

102.     Common issues predominate when, as here, liability can be determined on a class-wide basis, even when there will be some individualized damages determinations.

103.     As a result, when determining whether common questions predominate, courts focus on the liability issue, and if the liability issue is common to the class as is the case at bar, common questions will be held to predominate over individual questions.

**G. Superiority**

104.     A class action is superior to individual actions in part because of the non-exhaustive factors listed below:

> (a) Joinder of all class members would create extreme hardship and inconvenience for the affected customers as they reside all across the states;
>
> (b) Individual claims by class members are impractical because the costs to pursue individual claims exceed the value of what any one class member has at stake.   As a result, individual class members have no interest in prosecuting and controlling separate actions;
>
> (c) There are no known individual class members who are interested in individually controlling the prosecution of separate actions;
>
> (d) The interests of justice will be well served by resolving the common disputes of potential class members in one forum;
>
> (e) Individual suits would not be cost effective or economically maintainable as individual actions; and
>
> (f) The action is manageable as a class action.

43

**H.  Requirements of Fed. R. Civ. P. 23(b)(1) & (2)**

105.    Prosecuting separate actions by or against individual class members would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class.

106.    Defendants have acted or failed to act in a manner generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

## COUNT I

## COMMON LAW FRAUD

107.    Plaintiffs repeat and reallege each and every allegation above with the same force and effect as if fully set forth herein.

108.    Defendants falsely represented to Plaintiffs and other similarly situated students material information concerning the accreditation and/or the quality of the educational instruction and supervision and career placement services offered by The Art Institute of New York City and job placement and salary statistics for its graduates as set forth in detail in paragraphs 28 through 64 above.

109.    Defendants failed to disclose material information that the Art Institute of New York City failed to provide quality instruction and supervision to its students, that the touted career placement services were not offered by the Art Institute of New York City and that the job placement statistics of the Art Institute of New York City were false and manipulated so that Defendants EDMC and the Art Institute of New York City would meet certain requirements necessary to obtain Title IV funding.   Indeed, as the Consent Judgment reflects, Defendants

44

EDMC, the Art Institute of New York City and West made numerous materially false and misleading statements simply to lure a high number of students to enroll and stay enrolled in its programs in order to obtain federal Title IV funding.

110.    Defendants made these false and misleading representations and omissions concerning the job placement statistics and career placement knowingly, recklessly, and/or without regard for their truth or falsity, and with the intent to induce Plaintiffs and other students to rely upon them by enrolling in The Art Institute of New York City, paying for and obtaining loans to pay for their tuition and room and board, continuing their enrollment through graduation and obtaining a degree from The Art Institute of New York City.

111.    Defendants made these false and misleading representations and omissions concerning the job placement statistics and career placement under the authority, direction and control, and with the approval, of Defendants West, Nelson, and Mazzoni.

112.    Moreover, Defendant ACICS falsely represented that the Art Institute of New York City met the standards for accreditation by the ACICS, when it knew, or reasonably should have known, that it did not meet accreditation standards.  Defendant ACICS also knew, or reasonable should have known, that students and prospective students, including Plaintiffs and the Class, would reasonably rely on ACICS' accreditation of the Art Institute of New York City.

113.    Plaintiffs and other students justifiably relied upon the false representations and omissions made by Defendants by enrolling in The Art Institute of New York City, paying for and obtaining loans to pay for their tuition and room and board, continuing their enrollment through graduation and obtaining degrees from The Art Institute of New York City.

114.    As a direct and proximate result of Plaintiffs' and other students' reliance upon the false representations and omissions of Defendants, Plaintiffs have suffered damages,

including, but not limited to, having paid money to the Art Institute of New York City for an education which was falsely represented, being debt laden with hundreds of thousands of dollars in student loans which Plaintiffs obtained to pay for their enrollment at The Art Institute of New York City, being unable to obtain a job in their field of study and being unable to earn an annual salary approaching $30,000 in their chosen field.

115.    Because of the willful and wanton conduct of Defendants, Plaintiffs are entitled to punitive, as well as actual, damages.

116.    The statute of limitations for common law fraud is subject to tolling until December 2015 when the DOJ settlement with EDMC was announced and revealed for the first time Defendants' fraudulent scheme.

## COUNT II

## VIOLATION OF NEW YORK GENERAL BUSINESS LAW § 349

117.    Plaintiffs repeat and reallege each and every allegation above with the same force and effect as if fully set forth herein.

118.    Defendants' acts and practices alleged herein constitute acts, uses, or employment by Defendants and their agents of deception, fraud, unconscionable and unfair commercial practices, false pretenses, false promises, misrepresentations, or the knowing concealment, suppression, or omission of material facts with the intent that others rely upon such concealment, suppression, or omission, in connection with the sale or advertisement of merchandise, and with the subsequent performance, of defendant in violation of § 349 of New York's General Business Law, making deceptive and unfair acts and practices illegal.

119.    Defendants' conduct is deceptive because it is likely to mislead consumers and the public.  Indeed, Defendants represented to Plaintiffs and other students and potential students

that the Art Institute of New York City provided certain career placement services, when it did not, and also made materially false and misleading statements concerning the job placement and salaries of its graduates as set forth above in paragraphs 28 through 64.    Defendants EDMC and The Art Institute of New York City engaged in this deceptive conduct under the direction and control, and with the approval, of Defendants West, Nelson, and Mazzoni.

120.    Defendant ACICS, moreover, falsely represented that the EDMC schools, including the Art Institute of New York City, met the standards for accreditation by the ACICS, when it did not and ACICS knew or reasonably should have known that these standards were not being met.

121.    Defendants' representations to Plaintiffs and other students were materially misleading because they lead Plaintiffs to believe that The Art Institute of New York City provided (a) a certain level of educational accreditation, quality, instruction and supervision for its students, when it did not; (b) certain career placement services on behalf of its students and graduates, when it did not; (c) that it placed a high percentage (approximately 80%) of its graduates in jobs in their chosen field  of study within 6 months of graduation, when it did not; and (d) that graduates earned on average an annual salary of approximately $30,000 in their chosen field, when they did not.  Instead, as the Consent Judgment reflects, Defendants made numerous materially false and misleading statements simply to lure a high number of students to enroll and stay enrolled in its programs to obtain federal Title IV funding.  These false statements caused Plaintiffs and other students to believe that enrolling in the Art Institute of New York City was a good investment, that they should maintain their enrollment and earn their degree, and that they should take out loans to finance their tuition.

47

122.    Defendants' acts and misrepresentations constitute acts, uses, or employment by Defendants and their agents of deception, fraud, unconscionable and unfair commercial practices, false pretenses, false promises, misrepresentations, or the knowing concealment, suppression, or omission of material facts with the intent that others rely upon such concealment, suppression, or omission, in connection with the sale or advertisement of merchandise, and with the subsequent performance, of Defendants in violation of § 349 of New York's General Business Law, making deceptive and unfair acts and practices illegal.

123.    The unfair and deceptive trade acts and practices of Defendants have directly, foreseeably, and proximately caused damages and injury to Plaintiffs.

124.    The statute of limitations is tolled until December 2015, i.e., when the DOJ settlement with EDMC revealed the fraudulent misrepresentations and deceptive conduct directed towards consumers that are the basis of this claim.

125.    Plaintiffs have no adequate remedy of law.

## COUNT III

### VIOLATION OF PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW, 73 P.S. § 201-1, et seq.

126.    Plaintiff Bennett, on behalf of herself and all similarly situated students who are citizens and/or residents of Pennsylvania (the "Pennsylvania Subclass"), realleges and reincorporates by reference the allegations contained in each paragraph set forth above in this Complaint as if fully set forth herein.

127.    The Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-1, *et seq*., prohibits, *inter alia*, the following "Unfair methods of competition" and "unfair or deceptive acts or practices":

48

(iii) causing likelihood of confusion or of misunderstanding as to affiliation, connection or association with, or certification by, another; . . .

(v)  Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have . . .

(vii)  Representing that goods or services are of a particular standard, quality or grade,  . . . if they are of another; . . .

(ix) Advertising goods or services with intent not to sell them as advertised; . . .

(xxi)  Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding.

128.    Defendants have engaged in unfair methods of competition and unfair or deceptive acts or practices in the conduct of their trade and/or commerce in the State of Pennsylvania where Plaintiff Bennett resides by representing to students, like Plaintiff Bennett, that The Art Institute of New York City met the standards for ACICS accreditation, when it did not, that The Art Institute of New York City provided a certain level of educational instruction and supervision, when it did not, that The Art Institute of New York City provided certain career placement programs, when it did not, that approximately 80% of its graduates obtained jobs in their related fields of study within 6 months of graduation with average annual salaries of $30,000, when this was false;  that certain employers attended students' portfolio shows and hired and/or interned students from The Art Institute Of New York City, when they did not. Instead, as the Consent Judgment reflects, Defendants made these materially false and misleading statements in order to lure students to enroll and maintain their enrollment at The Art Institute of New York City so that Defendants could obtain federal Title IV funding.  Defendants EDMC, The Art Institute of New York City and Defendant West made these materially false and

49

misleading statements under the authority, direction and control, and with the approval, of Defendants West, Nelson, and Mazzoni.

129.    Defendant ACICS, moreover, falsely represented that the EDMC schools, including the Art Institute of New York City, met the standards for accreditation by the ACICS, when it did not, and ACICS knew or reasonably should have known that these standards were not being met.

130.    The Pennsylvania Unfair Trade Practices and Consumer Protection Law provides that "any person who purchases or leases goods or services primarily for personal, family or household purposes and thereby suffers any ascertainable loss of money or property, real or personal, as a result of the use of employment by any person of a method, act or practice declared unlawful by section 2 of this act, may bring a private action to recover actual damages or one hundred dollars ($100), whichever is greater. The court may, in its discretion, award up to three times the actual damages sustained, but not less than one hundred dollars ($100) and may provide such additional relief as it deems necessary or proper. The court may award to the plaintiff, in addition to other relief provided in this section, costs and reasonable attorney fees."

131.    Plaintiff Bennett is a "person" as that term is defined by the Pennsylvania Unfair Trade Practices and Consumer Protection Law.

132.    Plaintiff Bennett and the Pennsylvania subclass have suffered an ascertainable loss of moneys or property as a direct and proximate result of the Defendants' unfair and unconscionable practices.

133.    Plaintiff Bennett and the Pennsylvania subclass, as residents of Pennsylvania, have a private right of action against Defendants which entitles them to recover, in addition to

their actual damages, a threefold award of the damages sustained by any person's interest, as well as an award of reasonable attorney's fees, filing fees and reasonable costs of suit.

## COUNT IV

### Violation of the New Jersey Consumer Fraud Act ("NJCFA")

134.    Plaintiff Ortiz, a New Jersey citizen and resident, realleges and reincorporates by reference on behalf of himself and similarly situated students who are citizens and residents of New Jersey (the "New Jersey Subclass") the allegations contained in each paragraph set forth above in this Complaint as if fully set forth herein.

135.    The New Jersey Consumer Fraud Act ("NJCFA") prohibits the "use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation . . . in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby." N.J.S.A. 56:8-2.

136.    Defendants have engaged in unconscionable commercial practices, deceptive acts and misrepresentations in the conduct of their trade and/or commerce in the State of New Jersey where Plaintiff resides by representing to potential students, like Plaintiff and the New Jersey subclass, that The Art Institute of New York City provided a certain level of educational instruction and supervision, when it did not, that The Art Institute of New York City provided certain career placement programs, when it did not, and that approximately 80% of its graduates obtained jobs in their related fields of study within 6 months of graduation with average annual salaries of $30,000, when this was false.  Instead, as the Consent Judgment reflects, Defendants made these materially false and misleading statements in order to lure students to enroll and

maintain their enrollment at The Art Institute of New York City so that Defendants could obtain federal Title IV funding. Defendants EDMC, The Art Institute of New York City and Defendant West engaged in this deceptive conduct under the authority, direction and control, and with the approval, of Defendants West, Nelson, and Mazzoni.

137. Defendant ACICS, moreover, falsely represented that the EDMC schools, including the Art Institute of New York City, met the standards for accreditation by the ACICS, when it did not and ACICS knew or reasonably should have known that these standards were not being met.

138. The NJCFA further provides that "[a]ny person who suffers an ascertainable loss of moneys or property, real or personal, as a result of the use or employment by another person of any method, act, or practice declared unlawful under the [NJCFA] may bring an action or assert a counterclaim therefore in any court of competent jurisdiction. N.J.S.A. 56:9-19.

139. Plaintiff Ortiz and the members of the New Jersey subclass are "persons" as that term is defined in N.J.S.A. 56:8-1(d).

140. Plaintiff Ortiz and the New Jersey subclass have suffered an ascertainable loss of moneys or property as a direct and proximate result of the Defendants' unfair and unconscionable practices.

141. Plaintiff Ortiz and the New Jersey subclass have a private right of action against Defendants which entitles them to recover, in addition to their actual damages, a threefold award of the damages sustained by any person's interest, as well as an award of reasonable attorney's fees, filing fees and reasonable costs of suit. N.J.S.A. 56:8-19

## COUNT IV

## UNJUST ENRICHMENT

142.    Plaintiffs reallege and reincorporate by reference the allegations contained in each paragraph set forth above in this Complaint as if fully set forth herein.

143.    Plaintiffs conferred a benefit upon Defendants EDMC, The Art Institute of New York, West, Nelson, and Mazzoni by enrolling in The Art Institute of New York, paying and obtaining loans to pay for tuition and room and board for three years, and enabling Defendants to obtain Title IV funding and falsely enhance the price of EDMC stock.

144.    Defendants EDMC, The Art Institute of New York, West, Nelson, and Mazzoni have knowledge of this benefit and voluntarily accepted and retained the benefit conferred.

145.    Defendants EDMC, The Art Institute of New York, West, Nelson, and Mazzoni have been enriched at the expense of Plaintiffs because they retained the benefits, but denied Plaintiffs the promised educational instruction and supervision and career placement services and further denied Plaintiffs a degree which would enable them to obtain employment in their chosen field of study and an annual average salary of $30,000.

146.    It is against equity and good conscience to permit Defendants EDMC, The Art Institute of New York, West, Nelson, and Mazzoni to retain the aforementioned benefits.

## COUNT IIV
## Piercing the Corporate Veil

147.    Plaintiffs reallege and reincorporate by reference the allegations contained in each paragraph set forth above in this Complaint as if fully set forth herein.

148.    Plaintiffs seek to pierce the corporate veil to hold Defendants West, Nelson, and Mazzoni individually liable for their wrongful acts.

149.    During their tenure with EDMC and The Art Institutes, Defendants West, Mazzoni and Nelson held positions of control and authority as senior officers and were able to, and did, control the contents of various reports, press releases, public filings, and marketing brochures and advertisements for EDMC and The Art Institute of New York City.  Throughout the Class Period, Defendants West, Mazzzoni and Nelson exercised their power and authority to cause EDMC and The Art Institute of New York City to engage in the wrongful acts and fraudulent representations set forth herein.  Defendants West, Mazzoni and Nelson each exercised control over the general operations of EDMC and The Art Institute of New York City and possessed the power to control the specific activities which comprise the primary violations set forth in this Complaint.   As officers and/or directors of a publicly owned company, Defendants West, Mazzoni and Nelson had a duty to disseminate accurate and truthful information with respect to EDMC's and The Art Institute of New York City's operations, including graduate placement rates and statistics and career placement services, and to correct promptly any public statements which were materially false and misleading.

150.    Defendants West, Mazzoni and Nelson (a) disseminated false and misleading information concerning graduate placement rates and statistics and career placement services at EDMC for-profit schools, including The Art Institute of New York City; and (b) had knowledge, or reasonably knew and failed to disclose that the level of instruction, quality of equipment and career services were substandard, if not worthless, at the EDMC schools, including The Art Institute of New York City,  as part of a larger fraudulent scheme to increase student enrollment and enhance their own compensation.

151.    Good cause exists for piercing the corporate veil to avoid injustice because EDMC and The Art Institute of New York are grossly undercapitalized and do not have assets

sufficient to pay Plaintiffs' claims. Indeed, Plaintiffs Ortiz, Bennett and De La Cruz commenced individual arbitration against EDMC and The Art Institute of New York with JAMS in New York City in 2017 and 2018. Both EDMC and The Art Institute of New York were represented by Bob Kelley, Senior Counsel for EDMC. On March 8, 2018, Mr. Kelley wrote to JAMS with respect to the Ortiz arbitration and stated:

> My understanding is that EDMC, which no longer owns or operates any schools, is not in the financial position to be able to fund arbitration claims such as this, which would likely not be able to be heard prior to its ultimate cessation of operations and which would not result in a judgment against a collectible entity even if it was.   If you have any further questions, please do not hesitate to ask.

152.    As a result of the inability or unwillingness of EDMC and The Art Institute of New York to fund the claims in the individual arbitrations of Plaintiffs, EDMC and The Art Institute of New York entered into stipulations with Plaintiffs Ortiz, Bennett and De La Cruz in March 2018, which permit them to commence this action in court. Both EDMC and The Art Institute of New York stipulated that they "will not move to compel arbitration of any claims which may be brought in state or federal court" by Plaintiffs Ortis, Bennett and De La Cruz. Equity requires piercing of the corporate veil because of EDMC and The Art Institute of New York's admitted inability to pay and the Plaintiffs' strong allegations of fraud.

153.    EDMC and The Art Institute of New York, under the direction, authority, control and supervision of Defendants West, Nelson, and Mazzoni, were engaged in a massive fraud, including the making materially false statements about the graduate placement rates of its students in order to obtain Title IV funding, to continue to attract new students under false pretenses and increase enrollment, and to falsely inflate the price of the common stock of EDMC, all for the financial benefit of Defendants West, Nelson, and Mazzoni.

154.    Although EDMC was not profitable during Defendant West's tenure as CEO and sustained three consecutive annual loses, Defendants West, Nelson, and Mazzonni were paid millions of dollars annually as a result of their fraudulent conduct, which resulted, *inter alia*, in students, like Plaintiffs, undertaking hundreds of thousands of dollars in student loans from federal funding in order to attend The Art Institute of New York City based on false representations of graduates' job placement statistics and career placement services.  Defendant West's annual salary ranged between $3.5 million and $5.7 million during the relevant period. Defendant Nelson also was paid millions each year during the relevant time period ($3,804,121 in 2010, $13,000,000 in 2011, $1,384,314 in 2012 and $1,122,863 in 2013).  Defendant Mazzonni similarly was paid hundreds of thousands to millions of dollars annually during the relevant time period.  These multi-million dollar payments to Defendants West, Nelson and Mazzonni were the direct result of the uniform fraudulent scheme developed and implemented by Defendants West, Nelson and Mazzonni to falsify graduation statistics in order to increase federal funding and enrollment.

155.    Defendants West, Nelson, and Mazzonni blatantly used the corporate form of EDMC and The Art Institute of New York City to perpetrate fraud on Plaintiffs and other members of the Class.

156.    Justice requires recognizing the substance of the relationship over the form where, as here, the corporate form has been used to perpetuate a fraud and the corporate form is judgment proof.   An equitable result will be achieved only by disregarding the corporate form and holding Defendants West, Nelson and Mazzonni personally liable for their own fraudulent conduct and the fraudulent conduct of EDMC and The Art Institute of New York City.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

    A.  Actual damages for injuries suffered by Plaintiffs and the Class;

    B.  Injunctive relief, including, but not limited to, loan forgiveness on behalf of Plaintiffs and the Class;

    C.  Equitable relief, including piercing of the corporate veil and disgorgement; and

    D.  Reasonable attorney's fees and costs of this action, statutory damages and pre-judgment interest under GBL § 349, the NJCFA, and Pennsylvania Unfair Trade Practices and Consumer Protection Law, punitive damages for fraud, treble damages for violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law, the NJCFA, and such other relief as this Court may deem just and proper.

Dated:  May 24, 2018
New York, New York

                              Giskan Solotaroff & Anderson LLP

                              *Catherine E. Anderson*

                              Catherine E. Anderson, Esq.
                              217 Centre Street, 6th Floor
                              New York, NY 10013
                              Tel: (212) 847-8315 x 12
                              Email: canderson@gslawny.com

                              *Counsel for Plaintiffs and the Class*